IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GARY D. STOKES,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>LIFE INSURANCE OF NORTH AMERICA,<br><br>　　　　　Defendant. | Case No. CV-06-411-S-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion to amend, a motion to preclude application of the damage cap, and a petition for attorney fees filed by plaintiff Stokes. The Court heard oral argument on October 16, 2008. From the bench, the Court told counsel how it would handle the damages cap issue, and counsel agreed to that process. The Court took the other motions under advisement. For the reasons expressed below, the Court will grant Stokes' motion to amend, and grant Stokes' petition for fees.

**Memorandum Decision and Order – Page 1**

## ANALYSIS

1. **<u>Motion to Preclude Application of the Damages Cap</u>**

The Court advised counsel that if the issue survives a Rule 50 motion at the close of plaintiffs' case, the Court will submit to the jury questions regarding the existence of the intent elements necessary to preclude application of the damages cap, without informing them in any way about the cap or its effects. If the jury finds that those intent elements do not exist, the Court, rather than the jury, will apply the cap to whatever damages are awarded. All counsel agreed to this procedure. The Court will accordingly grant in part and deny in part the motion consistent with this ruling.

2. **<u>Stokes' Motion to Amend</u>**

Stokes has filed a motion to amend his complaint to add a claim for punitive damages. An award of punitive damages requires a bad act and a bad state of mind. The defendant must (1) act in a manner that was an extreme deviation from reasonable standards of conduct with an understanding of – or disregard for – its likely consequences, and must (2) act with an extremely harmful state of mind, described variously as with malice, oppression, fraud, gross negligence, wantonness, deliberately, or willfully. *Meyers v. Workmen's Auto Ins.* Co., 95 P.3d 977 (Id.Sup.Ct. 2004).

**Memorandum Decision and Order – Page 2**

At trial, Stokes must satisfy this standard by clear and convincing evidence. *See* Idaho Code § 6-1604(1).  For purposes of this motion to amend, however, Stokes does not need to meet this high burden – he need show only "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages."  *See* Idaho Code § 6-1604(2).  However, the heightened standard of proof must necessarily be considered in determining whether there is a "reasonable likelihood" of the Plaintiff proving facts at trial sufficient to support such an award.

In this case, Stokes seeks damages for the denial of his claim for disability benefits from defendant Life Insurance of North America (LINA).  Stokes alleges that he has met the "reasonable likelihood" standard with evidence showing that LINA committed a bad act with a bad state of mind when it denied Stokes claim for disability benefits.  The Court will not review all the facts, but just those necessary to rule on the motion to amend.

Stokes was originally considered disabled by LINA in 2000 due to unremitting headaches that led to a diagnosis of Polycythemia Vera.  LINA undertook a medical review of Stokes' condition in 2002 and again in 2004.  At the conclusion of that latter medical review, LINA informed Stokes that it would be

**Memorandum Decision and Order – Page 3**

ending his disability payments by the end of the month because "you retain the capacity to perform occupations on a light level."

LINA denied his claim even though the only three physicians who examined Stokes – Drs. Spencer, Cambareri, and Burke – all concluded that he was disabled. He was also considered as disabled by the Social Security Administration.

In concluding that Stokes was not disabled – and "retained the capacity to perform occupations of a light level" – LINA relied heavily on the opinions of two psychologists, Dr. Cohen and Dr. Benecasa. Neither had ever examined Stokes. Thus, a serious question is raised as to whether either was qualified to render an opinion on the ability of Stokes to work. Indeed, Dr. Benecasa did not venture such an unqualified opinion, but simply concluded that more testing should be done. Dr. Cohen goes somewhat further and says there is no "consistent and convincing evidence" of a "severe psychiatric or cognitive impairment" that would prevent Stokes from working. But Stokes's claim – and the conclusion of all the examining physicians – was that his headache pain was disabling. On that issue, Dr. Cohen goes no further than Dr. Benecasa, concluding simply that "it is not within the purview of a psychologist [her speciality] to make such a finding."

Here is the bad act: LINA ignores the opinions of the three treating physicians – and the Social Security Administration – who found Stokes disabled,

**Memorandum Decision and Order – Page 4**

and relied on the opinions of two psychologists who did nothing more than examine the paper record, and whose qualifications to render an opinion on Stokes' ability to work are in serious question. Because Idaho requires that this bad act be accompanied by a bad intent, the Court will turn to that issue next.

During LINA's first review of Stokes' case in 2002, LINA's Case Manager Mark D'Antonio wrote to Stokes, telling him that LINA's in-house physician, Dr. Mendez, had recently talked to Dr. Spencer, Stokes' treating physician. According to D'Antonio's letter, Dr. Mendez told him that Dr. Spencer had said that (1) Stokes' headaches "were no longer of a frequency or severity that would preclude you from sustaining work in your former capacity as an agent"; (2) that the headaches were "primarily due to stress"; (3) that Stokes' "biggest problem is that of a psychiatric nature . . . "; (4) that Stokes' earlier diagnosis of atypical trigeminal neuralgia was "discarded"; and (5) that Stokes was resistant to psychiatric evaluation.

On the basis of this information allegedly provided by Dr. Spencer, D'Antonio concluded that Stokes had failed to provide "compelling evidence of a physically disabling condition" and that at most he had a "mental illness" that qualified him for only 24 months of payments, the last of which would be made in 18 days, on June 30, 2002. D'Antonio gave Stokes 45 days to provide "compelling

**Memorandum Decision and Order – Page 5**

evidence of a physical condition, which would be severe enough, in and of itself, to preclude work capacity."

Within just six days from the date of D'Antonio's letter, Dr. Spencer responded with a letter of his own, claiming that all five of his alleged "opinions" discussed by D'Antonio were wrong. In countering D'Antonio's characterizations of his opinions, Dr. Spencer stated that (1) Stokes' headaches continued to be "severe and disabling"; (2) Stokes' headaches were not due to stress but were instead "due to an unidentified underlying illness"; (3) that it was unlikely the headaches were caused by a psychiatric illness because they were waking Stokes from sleep; (4) the diagnosis of atypical trigeminal neuralgia had never been discarded, and that Stokes suffered from a "consistent diagnostic abnormality, a markedly elevated serum ferritin"; and (5) that Stokes was not resistant to psychiatric evaluation, but found it inconvenient in his rural community to find psychiatric help, and further that Dr. Spencer and a neurologist tried to deal with Stokes' symptoms using psychiatric medications "but have not been successful."

In other words, D'Antonio was completely wrong in his account of Dr. Spencer's opinions. Perhaps D'Antonio was the innocent victim of mis-communication between himself and Dr. Mendez, or between Dr. Mendez and Dr. Spencer. But the way in which D'Antonio misrepresented Dr. Spencer's opinions

**Memorandum Decision and Order – Page 6**

across-the-board – consistently bending them beyond recognition to align with a diagnosis of mental illness – raises a serious question whether D'Antonio was steering this case to a pre-determined outcome.

Whatever the reason for D'Antonio's misrepresentations, LINA now knew Dr. Spencer's true opinions. Thus, LINA's repetition of those inaccuracies in the denial letter it sent to Stokes dated June 13, 2005, raises even more troubling questions about LINA's intent. In that letter, LINA once again alters Dr. Spencer's opinions by claiming that he concluded that Stokes was resistant to psychiatric evaluation, and that his headaches were psychiatric in nature, caused by stress and anger.

This evidence at least raises a likelihood that LINA was mischaracterizing the diagnosis of a treating physician to set this claim up for denial. An additional piece of evidence adding to that likelihood is the email sent by LINA's Janna Crow on November 10, 2004, asking Dr. Benincasa to review Dr. Burke's psychiatric report. Dr. Burke had examined Stokes at LINA's request as part of an IME, and concluded that Stokes was "unable to work at any occupation due to the constant, unremitting pain of his headache which distracts him from sustained concentration in activities such as numerical calculations or paying attention to sustained conversations." He also noted that the results of the three intelligence tests that he

**Memorandum Decision and Order – Page 7**

administered to Stokes "are also congruent with a lateralized lesion of the brain in the right cerebral hemisphere."

In her email asking Dr. Benincasa to review this report, LINA's Crow explains that "[t]his case does not seem supportive to us" and asks Dr. Benincasa

> "to clarify something for us on [Dr. Burke's] neuropsych[iatric] [report]. *The only thing that is keeping us from denying this* is that on page 8 of the testing, Dr. Burke stated that "unable to work at any occ[upation] due to the constant, unremitting pain of his headache which distracts him from sustained concentration in activities such as numerical calculations or paying attention to sustained conversations."

(emphasis added). Crow's statement could be interpreted a couple of ways. But one reasonable interpretation is that she was intentionally steering this case to a pre-determined outcome – a denial of benefits. Regardless of the interpretation of her comment, a question arises as to why Crow did not ask Dr. Burke for clarification if she was confused by his report – was she seeking a different result? This, in combination with the evidence set forth above, is important in determining whether Stokes has a reasonable likelihood of providing punitives.

There is more. In March of 2004, when LINA began its second review of Stokes' case, Stokes submitted a report of his treating oncologist, Dr. Richard Cambareri. Dr. Cambareri concluded that Stokes continued to suffer from Polycythemia Vera, with his symptoms including headaches. Under a box with

**Memorandum Decision and Order – Page 8**

five options for describing the claimant's degree of physical impairment, Dr. Cambareri checked the Class 4 option, which was described as "moderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity."

However, after examining Stokes on two subsequent occasions, Dr. Cambareri prepared a new report, where he concluded that Stokes was in the Class 5 physical impairment, which was characterized by "severe limitations of functional capacity; incapable of minimal (sedentary) activity." To questions asking if Stokes was a suitable candidate for rehabilitation or could be accommodated by modifications to his job, Dr. Cambareri answered "no." In other words, Dr. Cambareri was finding Stokes to be totally disabled.

Dr. Cambareri mailed this report to LINA in early May of 2005, and there is no dispute that LINA received it before making its decision to deny Stokes his disability benefit. Yet LINA did not consider it. Mary Vann of LINA testified that "[t]he mail room delivered it to the wrong place" and so the report was not placed in her file until June 15, 2005, a day before the denial letter was prepared on June 16, 2005. Vann testified that the decision to deny Stokes' benefits had been made about a week prior to June 16, 2005, during the time the report was lost in LINA's mail room. Yet, even after finding this report – a report from Stokes' longtime

**Memorandum Decision and Order – Page 9**

treating physician finding Stokes totally disabled – LINA did not reconsider its denial decision.

All of this evidence, when considered together, raises a reasonable likelihood that Stokes will be able to meet the standard for punitive damages. For that reason, Stokes' motion to amend will be granted.

### 3.   Petition for Fees

The Court previously awarded fees to Stokes for a discovery dispute with LINA, and Stokes has now submitted his petition seeking an award of $5,215 in fees. LINA objects because much of this sum was incurred in preparing Stokes' first motion to compel that was struck as being premature. However, if that motion had not been filed, the sum would be the same – Stokes used its work on the first motion to save time preparing the second motion.

LINA also objects to charging for the time spent in mediation on the issue with the Court's Law Clerk. Yet LINA was clinging to its frivolous position during that mediation and unnecessarily raising litigation costs. The Court will reject this objection as well, and will award the full amount of the fees sought.

**Memorandum Decision and Order – Page 10**

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to amend (Docket No. 48) is GRANTED.

IT IS FURTHER ORDERED, that the motion to preclude application of the damage cap (Docket No. 49) is GRANTED IN PART AND DENIED IN PART consistent with the Court's statements from the bench and in this Memorandum Decision.

IT IS FURTHER ORDERED, that the petition for fees (Docket No. 47) is GRANTED and Stokes shall have an award of attorney fees from LINA in the sum of $5215.00.



DATED:  **October 21, 2008**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order – Page 11**